IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

FREIGHTLINER LLC,

Plaintiff,

v.

PUERTO RICO TRUCK SALES, INC./ FREIGHTLINER DE PUERTO RICO d/b/a/ FREIGHTLINER TRUCK SALES AND SERVICES; UNITED CAPITAL & LEASING OF PUERTO RICO; LUIS CARRERAS IN HIS PERSONAL CAPACITY, HIS SPOUSE JANE DOE AND THEIR CONJUGAL PARTNERSHIP; JOSÉ TORRES IN HIS PERSONAL CAPACITY, HIS SPOUSE JANE ROE AND THEIR CONJUGAL PARTNERSHIP; MANUEL CARRERAS IN HIS PERSONAL CAPACITY, HIS SPOUSE MARY DOE AND THEIR CONJUGAL PARTNERSHIP,

Defendants.

CIVIL NO. 04-1950 (JAG)

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

Plaintiff Freightliner LLC ("Freightliner") manufactures and sells "Freightliner" brand trucks worldwide. In 1996, Freightliner and codefendant Puerto Rico Truck Sales, Inc./Freightliner de Puerto Rico executed an agreement for the distribution of Freightliner products, in Puerto Rico which was later assumed by codefendant Freightliner Truck Sales and Services ("FTSS") in the year 2000.

On September 10, 2004, Freightliner terminated the distribution agreement and filed a verified complaint on September 13, 2004 against Puerto Rico Truck Sales, FTSS and others, for breach of contract, damages and collection of monies. Freightliner also requested, pursuant to Fed. R. Civ. P. 57 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, a declaratory judgment on the validity of its termination of the distribution relationship. (Docket No. 1).

Freightliner terminated the distribution agreement due to FTSS's alleged lack of payment of substantial overdue amounts and because of FTSS's alleged illegal or wrongful shipment and importation of eighteen (18) Freightliner trucks into Puerto Rico. FTSS disputed Freightliner's termination of the distribution relationship stating the termination violates FTSS's rights under the Puerto Rico Dealer's Act, Act 75, 10 L.P.R.A. § 278 *et. seq*. ("Act 75"), and filed a counterclaim requesting damages pursuant to the Act. (Docket No. 41). Eventually, codefendants FTSS and Mr. Luis Carreras requested preliminary injunctive relief pursuant to Act 75 as alleged in its counterclaim. Specifically, FTSS, through Mr. Luis Carreras, claimed the parties had modified the payment terms in the distribution agreement to the effect FTSS did not have to pay Freightliner for trucks it ordered until after FTSS had been paid by its end customer. Also, that the eighteen (18) trucks had been shipped by Freightliner as a ruse to terminate FTSS. These codefendants essentially requested the Court to dissolve the termination and enjoin Freightliner from working with any other distributor in Puerto Rico. (Docket No. 70). An evidentiary hearing was held on February 16-17 and the afternoon of February 18, 2005 for resolution of FTSS' Preliminary Injunction Petition which was referred by the Court for

report and recommendation as per Local Rule 72 and 28 U.S.C. § 636 (Docket No. 73).   This

Magistrate Judge is now in a position to issue the proposed findings of facts, analysis of the

applicable law to those facts and the recommendation.

## II.  PROCEDURAL BACKGROUND

1.  On September 13, 2004, Freightliner filed a Verified Complaint against Defendants

for, among other things, breach of contract, damages and collection of monies under Articles

1054, 1061 and 1206 *et seq*. of the Puerto Rico Civil Code, Tit. 31 P.R. Laws Annotated §§

3018, 3025, 3371 *et. seq*.

2.   Together with the Verified Complaint, Freightliner filed a motion seeking a

Temporary Restraining Order, Preliminary Injunction and an Order to Show Cause enjoining

defendants from taking any action directed at obtaining possession of fourteen (14) Freightliner

trucks under the custody of the U.S. Customs in a Puerto Rico warehouse without authorization

from Freightliner.  These trucks were detained by Custom upon being non-compliant with

federal standards and were not to be released unless "federalized".

3.  Upon consideration of Freightliner's Verified Complaint, its motion for a Temporary

Restraining Order and the exhibits in support thereof, the Honorable United States District

Judge Jay A. García-Gregory issued the requested Temporary Restraining Order ("TRO")

recognizing Freightliner "will suffer irreparable harm if defendants are allowed to take possession

of the trucks subject to this action given their past failure or inability to make overdue payments

totaling over one-million eight-hundred thousand dollars."  (Docket No. 4).

4. In the aforementioned TRO, the Court enjoined "the defendants and/or their successors, agents, servants, employees, and attorneys, and those persons in active concert and participation with them" from taking any action to obtain possession of fourteen (14) Freightliner trucks under custody of the U.S. Customs and/or Intership in a warehouse in Puerto Rico. A preliminary injunction hearing was scheduled for September 22, 2004 to allow the defendants to show cause why an Order should not be issued granting Freightliner's request for preliminary injunctive relief.

5. At the preliminary injunction hearing held on September 22, 2004 before this Magistrate Judge upon the Court's referral, defendants stated the injunction was unnecessary because the trucks were non-compliant and they would not attempt to take possession of the trucks until "federalized" to make them suitable for importation into the United States. Therefore, defendants expressed no objection to the preliminary injunction requested by Freightliner.

6. After the preliminary injunction hearing, this Magistrate Judge issued a Report and Recommendation which favorably recommended the granting of plaintiff's preliminary injunction request. (Docket No. 18). The Court adopted the Report and Recommendation by Order of November 12, 2004. (Docket No. 45).

7. On September 24, 2004, McNeilus Financial, Inc. d/b/a McNeilus Truck and Manufacturing Co. filed an Intervenor Complaint against defendants, seeking payment of over

$425,950.00 related to the bodies it installed on the fourteen (14) trucks mentioned above. (Docket No. 21).

8.   On November 5, 2004, defendants filed their Answer to Complaint with Jury Demand, Counterclaim and Request for Preliminary Injunction against Freightliner.  (Docket No. 41).

9.   On November 29, 2004, Freightliner filed a motion to strike Puerto Rico Truck Sales, Inc./Freightliner Truck Sales and Services' demand for jury trial.  (Docket No. 54).  Said motion was granted by Order of December 13, 2004 (Docket No. 64).

10.   By Order of December 2, 2004, the Court approved a stipulation signed on November 30, 2004, wherein the parties requested the Preliminary Injunction Order be modified in order to ship the fourteen (14) trucks detained by federal authorities out of Puerto Rico.  (Docket Nos. 55 and 56).

11.   On December 2, 2004, the Court granted McNeilus' request for voluntary dismissal of Intervenor´s Complaint (Docket Nos. 59 and 60).  On December 3, 2004, partial judgment dismissing without prejudice the Intervenor's Complaint was issued.  (Docket No. 61).

12.   On December 23, 2004, Freightliner filed its Answer to Defendants' Counterclaim. (Docket No. 68).

13.   On  January 11, 2005, codefendants FTSS and Mr. Carreras filed a Motion for Temporary Restraining Order and Preliminary Injunction Under the Dealers' Act and Memorandum of Law in Support Thereof.  (Docket No. 70).

14. By Order of January 12, 2005, Judge Jay A. García Gregory denied codefendants' request for TRO and referred the motion for preliminary injunction to this Magistrate Judge for proposed findings of fact and recommendations for disposition. (Docket No. 73). The hearing on the Motion for Preliminary Injunction was set for February 16, 2005. (Docket No. 75).

15. On January 28, 2005, Freightliner filed an Opposition to Codefendants' Motion for Preliminary Injunction. (Docket No. 78).

16. On February 11, 2005, codefendants filed an Urgent Motion Requesting the Addition of Second Inquiry at the February 16, 2005 Hearing on the Issue of Perjury or Fraud Upon the Court. (Docket No. 81). On February 13, 2005, Freightliner opposed said urgent motion. (Docket No. 82). On February 15, 2005, these motions were referred to this Magistrate Judge. (Docket No. 85).[1]

17. The parties having briefed their respective positions on the request for injunctive relief, the evidentiary hearing on codefendants' request for preliminary injunction was held on February 16, 17 and 18, 2005.

18. On February 17, 2005, codefendants filed a motion *in limine* under Fed. R. Civ. P. 615 to exclude the testimony of Ricardo García (Docket No. 87). Said motion was denied in open court and a reconsideration was filed by codefendants on February 22, 2005 (Docket No. 92). An opposition to the request for reconsideration was filed by Freightliner on February 25,

[1] The second inquiry refers to issues raised for the TRO (Docket No. 5) of September 14, 2004 and considered by Judge García Gregory in rendering his decision. For this reason, the Urgent Motion and the Response (Docket Nos. 81, 82) are deferred to the Court.

2005, (Docket No. 95). Defendant's request for reconsideration was denied by order of March 10, 2005. (Docket No. 101).

19. On February 22, 2005, codefendants filed a motion to strike from the record the affidavits by Sabina Vieru (Docket No. 93). On February 24, 2005, Freightliner filed its Opposition to said motion. (Docket No. 94). On March 10, 2005, defendants' motion to strike the affidavits of Sabina Vieru was denied. (Docket No. 103).

20. At the close of codefendants' evidence, Freightliner argued a motion for dismissal under Fed. R. Civ. P. 52(c). This Magistrate Judge did not rule on said motion and held it in abeyance. The motion was renewed at the close of plaintiff's evidence and the ruling was again withheld.

## III. FACTUAL BACKGROUND

### A. The Non-Exclusive Distribution Agreement.

Plaintiff Freightliner is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Portland, Oregon. Freightliner manufactures, sells and services several truck brands, including Freightliner trucks. (Docket No. 1 at p. 4). Freightliner sells and markets Freightliner brand products in Puerto Rico through its affiliated company Daimler Chrysler Vehículos Comerciales Mexico S.A. de C.V. ("DCVC Mexico") (Transcript ("Tr.") at p. 304).

Codefendant FTSS is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Cataño, Puerto Rico. (Docket No. 1 at p. 5).

On March 6, 1996, plaintiff Freightliner and Puerto Rico Truck Sales Inc. signed an International Distributor Sales and Service Agreement (the "Agreement") for the non-exclusive distribution and sale of Freightliner trucks in Puerto Rico. (**Joint Exhibit I**). This Agreement continued in effect until it was terminated by Freightliner in September 2004. Section 5 of the Agreement provides that "[e]xcept where otherwise permitted, payment must be either by cash in advance of production, or by irrevocable documentary letter of credit in form acceptable to Company." Section 24 of the Agreement further states the terms cannot be "altered, enlarged, supplemented or abridged except by a in writing" duly signed by the parties. (**Joint Exhibit I pp. 3, 13**).

On or about 2000, Puerto Rico Truck Sales, Inc. became FTSS and codefendant Luis Carreras took over as president of the company. (Tr. at pp. 101 and 178). According to Mr. Carreras' testimony, FTSS assumed the distribution of Freightliner products in Puerto Rico (Tr. at pp. 102-103). However, Mr. Carreras claims the payment terms of the Agreement were modified by the parties. (Tr. at pp. 104-106). Nonetheless, Mr. Carreras testified the payment terms contained in the Agreement were never modified or altered in writing by the parties, as required by Section 24. (Tr. at p. 179). Freightliner's position is the payment terms were never modified as alleged by Mr. Carreras. (Docket No. 78).

FTSS claims it never paid Freightliner for trucks in advance of production as required by Section 5 of the Agreement. Mr. Carreras testified that, pursuant to a verbal agreement between FTSS and Freightliner, FTSS always paid Freightliner for the trucks ordered after it had sold the trucks to the end customer and FTSS had been paid for them. In essence, FTSS's position is that Freightliner sold to FTSS on consignment terms. (Tr. at pp. 104-105, 109, 157, and 214-215). In fact, according to Mr. Carreras, when FTSS placed an order with Freightliner, it already had a local purchaser for the truck. (Tr. at pp. 244-245). Thus, FTSS essentially would "pass-through" the purchase costs of the trucks directly to end customers.

In support of its contention the sale of Freightliner trucks to FTSS were on consignment terms, Mr. Carreras testified Freightliner would send FTSS the truck titles before the trucks were paid to Freightliner. (Tr. at pp. 154 and 162-163). However, Ms. Glenda Cruz-Cruz, who was in charge of making payments and receivables at FTSS, testified Freightliner only delivered truck titles to FTSS once the trucks had been paid in full by FTSS or by the financial institution providing the payment guarantee. (**Defendants' Exhibits J, L, and N**; **Tr. at pp. 71-73, 83, and 96**). Ms. Cruz testified FTSS needed those titles to collect payment from the end customer. (**Defendants' Exhibits M, N, and S**; **Tr. at 96**).

**B. FTSS' Debt to Freightliner**.

Freightliner claims that, since the beginning of the distribution relationship between the parties, FTSS's payment history had been very poor and its truck account and parts account had to be put on "credit hold" on numerous occasions. **(Defendants' Exhibit FF at p. 2**).

Although FTSS disputes this claim, Mr. Carreras' testimony confirmed the fact FTSS's accounts payable with Freightliner always had a substantial balance, in the range of $500,000 to $3,000,000. (Tr. at pp. 246-247).

FTSS's financial statements for the year 2003 state FTSS had an accounts payable to Freightliner of over $2.5 million. (**Plaintiff's Exhibit 4; Tr. at pp. 208-210**); and the financial statements for the period that ended June 30, 2004, state that FTSS had an accounts payable in excess of $3.2 million. Mr. Carreras testified most, if not all of the $3.2 million, was owed to Freightliner. (**Plaintiff's Exhibit 5; Tr. at pp. 211-212**).

During the period of July 2003 to February 2004, FTSS placed purchase orders for thirty eight (38) Freightliner trucks. These orders were accepted by Freightliner upon reliance of payment guarantees provided by codefendant United Capital and Leasing of P.R. ("United"). United issued letters of guarantee for each of the thirty eight (38) trucks ordered.[2] (**Defendants' Exhibit FF**; **Tr. at pp. 183-184**). However, neither FTSS nor United paid Freightliner for those trucks. (**Defendant's Exhibit FF**).

Freightliner's contention is FTSS owes Freightliner over $1.8 million for the thirty eight (38) trucks ordered. (**Defendants' Exhibit FF at p. 6**). FTSS's position initially was it did not owe payment for the thirty eight (38) trucks (Tr. at p. 180), but it later admitted certain amounts for those trucks were indeed overdue. (Tr. at pp. 180-183).

[2] Mrs. Marla Infanzón Ledesma, General Manager of United, testified as to providing financing to FTSS purchases of Freightliner trucks and issuing payment guarantee to Freightliner through letters of credit.

Thus, the fact FTSS does owe Freightliner a substantial amount of money is uncontested. Mr. Carreras, who is also the president and principal owner of United (Tr. at pp. 47 and 205), testified that to this day, FTSS still owes Freightliner for eighteen (18) of the thirty eight (38) trucks ordered and that FTSS's current debt to Freightliner exceeds $900,000.00. (*See* Open Account Statement included as part of both **Defendants' Exhibits AA and FF; Tr. at pp. 155-157 and 180-183**). In fact, Mr. Carreras testified United issued letters of payment guarantee for the eighteen (18) trucks admittedly owed by FTSS, but has not issued payment to Freightliner for said eighteen (18) trucks. (Tr. at pp. 206-207).

The only agreements in written form between Freightliner and United regarding payment of the trucks ordered by FTSS were the letters of guarantee. (Tr. at p. 56). Pursuant to the terms of the letters of guarantee issued by United on behalf of FTSS, payment to Freightliner had to be made no more than twenty (20) days from arrival at port of chassis of the trucks. (**Defendants' Exhibit FF; Tr. at 52**). However, payments for the trucks were usually made directly by FTSS to Freightliner many months after the twenty (20) days period contained in the United letters of guarantee had expired. (Tr. at pp. 52-53).

United terminated its relationship with Freightliner by letter of August 27, 2004. (**Defendants' Exhibit G; Tr. at pp. 56-59 and 207**). Mr. Carreras, as President of United, authorized the letter of August 27, 2004, terminating the relationship with Freightliner. (Tr. at p. 251). This termination by United occurred prior to Freightliner's termination letter of September 10, 2004 to FTSS.

The evidence presented also showed that, as part of the payment process between FTSS and Freightliner, Freightliner received sixteen (16) checks from FTSS that totaled $1,012,049.75, as short term guarantees of a future order which would be replaced with wire transfers. When FTSS and Mr. Carreras issued these checks they knew they lacked sufficient funds in the accounts and when deposited, these were all returned for insufficient funds. (**Defendants' Exhibit FF; Tr. at pp. 96-97**). Even though the checks had a notation "do not deposit wire transfer guarantee" or "date to deposit will be notified" (**Defendants' Exhibit FF**) that did not invalidate them, as a matter of law, as negotiable instruments.

**C. The Eighteen (18) Non-compliant Trucks**.

In August 2004, Freightliner discovered the eighteen (18) trucks ordered by FTSS during 2003, which had been sent by DCVC Mexico to the body builder, Mezcladoras y Trailers de Mexico, S.A. ("Mezcladoras"), and were supposed to be in Mexico on hold pending payment, had been shipped to Puerto Rico. (**Defendants' Exhibit FF, Plaintiff's Exhibit 13; Tr. at pp. 338-340**). According to Freightliner, the eighteen (18) trucks delivered by DCVC Mexico to Mezcladoras had been placed on hold because FTSS had not paid for them and had failed to comply with promises to make payment schedules to reduce its past debt. Mr. Luis Ricardo García of DCVC Mexico testified[3] he instructed Mr. Sebastián Vidal of Mezcladoras Mexico to hold the trucks at their facilities pending confirmation of payment by FTSS. (Tr. at pp. 324-325). Mr. García was the person, who on behalf of Freightliner, was in charge of the

[3] Codefendants' objection to the testimony of Mr. Ricardo Garcia was overruled at the hearing and the written opposition was also denied by this Magistrate Judge (Docket No. 101).

sale of Freightliner products in Puerto Rico and had frequent contacts with FTSS. (Tr. at pp. 303-305).

FTSS's contention is that Freightliner was the one who shipped the eighteen (18) trucks to Puerto Rico. Freightliner claims these eighteen (18) trucks were shipped from Mexico to Puerto Rico without authorization or documentation from Freightliner. (Tr. at p. 344). According to the testimony of Ms. Sabina Vieru, Freightliner's Export Finance Analyst,[4] Freightliner never issued the commercial invoices required for these eighteen (18) trucks to be shipped to Puerto Rico. (**Defendants' Exhibit FF; Tr. at pp. 266-275**).

FTSS presented into evidence documents produced by the customs broker Néstor Reyes, Inc. that were allegedly used to ship the eighteen (18) trucks to Puerto Rico **(Defendants' Exhibit BB**) which Freightliner claims were not prepared by it. (**Defendants' Exhibit FF; Tr. at 266-275**).

Ms. Sabina Vieru testified she is the only Freightliner employee who prepares commercial invoices for the export market, which includes Puerto Rico (Tr. at pp. 263-266), and according to her uncontested testimony, she did not prepare the commercial invoices apparently used to ship the eighteen (18) Freightliner trucks from Mexico to Puerto Rico. (**Defendants' Exhibit FF; Tr. pp. 266-275**). Ms. Vieru also testified the Certificates of Origin used to ship the eighteen (18) trucks were not prepared by Freightliner or its sister company DCVC Mexico because they would have needed the commercial invoices and, again,

[4] Codefendants' objection to the Ms. Sabina Vieru's previous affidavit was overruled at the hearing and the written opposition was also denied by this Magistrate Judge (Docket No. 103).

these invoices were never issued by her. (Tr. at pp. 275-278). She also indicated the name of the exporter on the alleged Certificates of Origin was incorrect because ten (10) months prior to the date on the documents, the name of the company had changed from Mercedes Benz Mexico S.A. to DCVC Mexico. (Tr. at pp. 275-278).

Mr. Carreras testified he did not know who prepared the commercial invoices and Certificates of Origin used to ship the eighteen (18) trucks from Mexico to Puerto Rico and he only assumed it was Freightliner because that is the name which appears on the top of the documents. (**Defendants' Exhibit BB; Tr. at pp. 220-223**).

The eighteen (18) trucks which Freightliner alleges were illegally shipped to Puerto Rico each had a body installed at Mezcladoras and FTSS was the one who had the contract with Mezcladoras to install the bodies on the trucks. (Tr. at p. 194). DCVC Mexico and Freightliner did not have any contract with Mezcladoras for the placing of the body on the chassis of the trucks (Tr. at pp. 312-313).

Mr. García testified DCVC Mexico (Freightliner) is only responsible for one delivery of the trucks (Tr. pp. 310-311) and the one delivery was made to Mezcladoras in Puebla, Mexico, as per FTSS's instructions. (Tr. at pp. 312-313 and 321). DCVC Mexico never received instructions from FTSS to deliver the eighteen (18) trucks from the Freightliner plant to Puerto Rico. (Tr. at pp. 311-312).

Furthermore, the evidence shows it was FTSS, not Freightliner, who paid the shipping, insurance, delivery and customs costs on the eighteen (18) trucks (Tr. at pp. 200-201) and

contracted Néstor Reyes, Inc. as the customs broker to introduce the eighteen (18) trucks into Puerto Rico. (**Defendants' Exhibit BB; Tr. at p. 219**).

According to uncontested testimony by both parties, the eighteen (18) trucks were shipped by Mezcladoras to FTSS in two (2) different shipments. There was a first shipment of four (4) trucks and a second shipment of fourteen (14) trucks. (**Defendants' Exhibit BB; Tr. at pp. 200 and 203-204**).

The eighteen (18) trucks ordered by FTSS were part of an order of twenty two (22) units placed by Mr. José Torres on behalf of FTSS. (Tr. at pp. 313-314). According to the testimony of Mr. García, Mr. Torres was the person at FTSS who would send DCVC Mexico the specifications of the trucks FTSS wanted to order. (Tr. at pp. 307-308).

Mr. García further testified the eighteen (18) trucks were part of a special order placed by FTSS requesting these trucks for immediate delivery because it had clients who were going to participate in certain bids. In order to comply with FTSS's request, Freightliner offered FTSS eighteen (18) trucks produced for the local Mexico market. (Tr. at pp. 312-314). The specifications of the eighteen (18) trucks offered by Freightliner stated the trucks lacked antilock brake systems ("ABS"). The specifications were sent to Mr. Torres at FTSS and he confirmed the order based on said specifications. **(Plaintiff's Exhibits 9, 11; Tr. at pp. 314 and 316-318**). Mr. Carreras testified he did not review the specifications of the eighteen (18) trucks before FTSS placed the order. (Tr. at pp. 192-194).

Mr. García testified the eighteen (18) trucks did not comply with United States' laws and regulations because they lacked ABS and did not meet Federal Motor Vehicle Safety Standards ("FMVSS"). (Tr. at pp. 314-316). Pursuant to Mr. García's uncontroverted testimony and the documentary evidence, it is evident Freightliner informed FTSS the eighteen (18) trucks did not have ABS before the order was placed. (**Plaintiff's Exhibit 10, 11, 12; Tr. at pp. 315-318**). Furthermore, Freightliner informed FTSS that FTSS was responsible for installing the ABS. (**Plaintiff's Exhibit 12; Tr. at p. 334**). Moreover, Mr. García testified it was his understanding Mr. Torres and FTSS were going to install ABS in the eighteen (18) units in Mexico prior to their shipment to Puerto Rico. (Tr. at pp. 329-330 and 370-371).

According Mr. García's testimony, in May 2004, when FTSS sent a communication regarding the problem with the ABS, Freightliner understood the eighteen (18) trucks were still "on hold" at Mezcladoras in Puebla, Mexico. (Tr. at pp. 335-337). The communication sent by FTSS states the eighteen (18) trucks were still at Mezcladoras in Mexico, however, by then, four (4) of the eighteen (18) trucks had arrived in Puerto Rico in February-March 2004 and had been sold by FTSS to its end customer, Andrés Reyes Burgos, Inc. (**Plaintiff's Exhibit 12; Tr. at pp. 135, 203-204**).

Andrés Reyes Burgos, Inc. financed the four (4) trucks with Daimler Chrysler Caribbean; and FTSS was paid $279,700 for the four (4) trucks. However, FTSS never paid Freightliner for the four (4) trucks sold to Andrés Reyes Burgos, Inc. (Tr. at pp. 204-205 and 250).

Mr. García testified fourteen (14) of the eighteen (18) trucks had to be eventually re-shipped to Mexico because of the lack of ABS and the costs involved to date are approximately $230,000. (Tr. at pp. 344-346).

**D. The Termination Letter**.

Freightliner terminated FTSS' non-exclusive distribution contract by letter of September 10, 2004 (**Defendants' Exhibit AA**).

According to codefendant Mr. Carreras' testimony, FTSS has not lost Freightliner clients as a result of the September 10, 2004, termination. (Tr. at p. 107). Mr. Carreras also testified the only way in which the termination has affected FTSS is in loss of reputation and loss of potential sales. (**Defendant's Exhibits DD, EE; Tr. at pp. 163-165**).

Mr. Carreras testified that, if FTSS prevails in its request for injunctive relief and is reinstated as a distributor of Freightliner, it will pay Freightliner for the trucks ordered according to the consignment agreement he alleges they had, that is, it will pay Freightliner after the truck is sold by FTSS in Puerto Rico to the end customer. (Tr. at p. 215). He also testified that he no longer trusts the people who work for Freightliner. (Tr. at pp. 216-217).

## IV. LEGAL STANDARDS

### A. LAW 75 GOVERNS THIS CASE.

There should be no controversy, at this stage of the proceedings, as to the existence of a non-exclusive distribution agreement in Puerto Rico between Freightliner and FTSS (**Joint Exhibit 1**). In fact, Freightliner filed the Verified Complaint in this case for breach of contract,

lack of good faith and fair dealing, damages, collection of monies and declaratory judgment based on the principal-distributor relationship with PRTS/FTSS, as described in the Distributor Sales and Service Agreement for the non-exclusive distribution of Freightliner products in Puerto Rico. (Docket No. 1). Thus, for Freightliner to now challenge the existence of the non-exclusive distribution Agreement is contradictory and without merit. In addition, the Agreement was in good standing and was terminated upon written notice by Freightliner through letter of September 10, 2004 **(Defendant's Exhibit AA).**[5]

Under these circumstances, the provisions of the Puerto Rico Dealer's Act, for the non-exclusive distribution agreement in Puerto Rico should be considered applicable, at least *prima facie*. 10 L.P.R.A. 278 *et seq.* (Law 75).

**1. Law 75 provisions.**

Puerto Rico's Law 75 governs the business relationship between principals and the locally appointed distributors who market their products. *See* Caribe Indus. Systems, Inc. v. National Starch and Chemical Co., 212 F.3d 26, 29 (1st Cir. 2000); Irvine v. Murad Skin Research Labs, Inc., 194 F.3d 313, 317-18 (1st Cir. 1999).[6] In order to avoid the inequity of arbitrary termination of distribution relationships once a distributor has developed a local market for the principal's products or services, Law 75 limits the principal's ability to unilaterally end the relationship except for "just cause." P.R. Laws Ann. Tit. 10, § 278a. *See* Matosantos

[5] In fact, the Agreement is the only Joint Exhibit submitted into evidence by the parties during the preliminary injunction hearing.

[6] *See* Richard M. Krumbein, *Protectionism in Puerto Rico: The Impact of the Dealers' Contract Law on Multinational Companies Planning Operations in Puerto Rico*, 25 Case W. Res. J. Int'l L. 79, 118, note 3 (1993).

Commercial Corporation v. SCA Tissue of North America, 2004 WL 1778279 (D. Puerto Rico 2004).

**2. Codefendant FTSS is considered a dealer/distributor under Law 75.**

Law 75 defines a "dealer" at 10 L.P.R.A. § 278(a) as follows:

> a person actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service.

A "Dealer's Contract" is defined in § 278(b) as a:

> relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico.

*See generally* Linea Aéreas Costarricenses, S.A. v. Caribbean General, Inc., 682 F.Supp. 117, 121 (D. Puerto Rico 1988); González v. Brown Group, 628 F.Supp. 436, 439 (D. Puerto Rico 1985).

Trial courts have discretion to apply a series of factors (facts and circumstances surrounding the supplier/distributor/sales relationship) which determine whether or not relationship is protected by Law 75. Marina Industrial, Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983) (*relying* on Warner Lambert Company v. Tribunal Superior, 101 D.P.R. 378 (1973)). Law 75 is to be liberally construed in favor of finding the distribution relationship. *See, e.g.*, Computec Systems Corp. v. General Automation, Inc., 599 F.Supp. 819, 826 (D.P.R. 1984)

(where a distributor sued for slander of business reputation: "[t]he Act provides for a liberal interpretation in furtherance of the remedial considerations behind it.")

Law 75 provisions were intended to protect Puerto Rico's dealers from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products, "thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities," Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d 817, 820 (1st Cir. 1988). The Act has been described as "very much a 'one-way street' designed to protect dealers from the unwarranted acts of termination by suppliers," Nike Int'l Ltd. v. Athletic Sales, Inc., 689 F.Supp. 1235, 1237 (D.P.R. 1988).

Codefendant FTSS has established *prima facie* that, for the purposes of the preliminary injunctive relief, he be considered a dealer subject to the protections and remedies afforded by Law 75, because, among other things, the existence of the exclusive Distribution Agreement which is not in controversy (**Joint Exhibit I**). Whether codefendant FTSS would fulfill on the merits all factors to be considered in determining the existence of a dealer or distributor under Law 75, is to be determined at a later stage.[7]

**B. STANDARD FOR PRELIMINARY INJUNCTION UNDER ACT 75.**

______Under the Puerto Rico Dealer's Act ("Act 75"), P.R. Laws Ann. Tit. 10, § 278, *et. seq*., the moving party has the burden of showing why the request for preliminary injunction should

[7] *See generally* Au-Port, Inc. v. MBR Industries, Inc., 772 F.Supp. 1301 (D. Puerto Rico 1991); Borg Warner International Corp. v. Quasar Company, 138 D.P.R. 60 (1995); Roberto Gómez, Inc. v. Oxford Industries, Inc., 122 D.P.R. 115 (1988).

be granted. *See* Picker International v. Kodak Caribbean, Ltd., 826 F. Supp. 610, 613 (D.P.R. 1993). Also, "courts should not be quick to issue preliminary injunctions in these cases; the equities and interests of all sides must be carefully considered." *Id.* (*quoting* Systema de Puerto Rico, Inc. v. Interface Int., Inc., 123 D.P.R. 379, 387 (1989)).

The Court of Appeals for the First Circuit uses a four-part test to determine the appropriateness of injunctive relief, which is: "1) movant's probability of success on the merits; 2) the likelihood of irreparable harm absent preliminary injunctive relief; 3) a comparison between the harm to the movant if no injunction issues and the harm to the objector if one does issue; and 4) how the granting or denial of an injunction will interact with the public interest." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002) ("[t]he *sine qua non* of this four-part inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity"). [8]

Under Act 75, courts must examine the interplay between the traditional criteria for injunctive relief and the relevant provisions of the Act. Courts are not required to apply all requirements of a traditional injunction in their analysis of Act 75 provisional remedies; however, this does not mean that the provisional remedies of Act 75 are independent from the provisions of the Rules of Civil Procedure. Aybar v. F. & B. Mfg. Co., 498 F.Supp. 1184, 1190 (D.P.R. 1980). As explained in Aybar, the Puerto Rico Legislature was not creating additional

[8] *See generally*, Narragansett Indian Tribe v. Guilbert, 934 F.2d 4 (1st Cir. 1991); Caroline T. v. Hudson School Dist., 915 F.2d 752, 754-755 (1st Cir. 1990); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914-915 (1st Cir. 1989).

remedies when it included the injunction remedy, but merely "making use of available resources" that are subject to traditional procedural safeguards. *Id.* at 1191-92. Such “procedural safeguards” include taking into account the likely presence or absence of “just cause” as part of the likelihood of success on the merits criteria when determining the appropriateness of injunctive relief. Luis Rosario v. Amana Refrigeration, Inc., 733 F.2d 172 (1st Cir. 1984); Systema de Puerto Rico, 123 D.P.R. at 387 (traditional injunction criteria apply in Act 75 cases when tempered to the purposes of the Act); Picker Int’l, 826 F. Supp. at 613 (“a consideration of the public policy of Law 75 would involve an examination of whether there was just cause for the termination of the contract. This would in effect be an examination of the movant’s likelihood of success).”

In sum, the standard for a preliminary injunction under Act 75 includes weighing the parties' interests and the injunction’s effect on statutory policies; an examination into the threat of irreparable harm; the existence of “just cause”; and the overall merits of the case. *See* Picker Int'l, 826 F.Supp. at 613; *see also* Pan Am. Computer Corp. v. Data Gen. Corp., 652 F.2d 215, 217 (1st Cir. 1981); Systema de Puerto Rico, 123 D.P.R. at 387.

## V. LEGAL ANALYSIS

### A. Application of Act 75 Requirements for Entitlement to Injunctive Relief

#### 1. Codefendants Failed to Demonstrate a Likelihood of Success on the Merits.

Freightliner contends codefendants did not meet their burden for injunctive relief primarily because they failed to show they are likely to succeed on their Act 75 claim. Plaintiff

Freightliner claims it did have just cause to terminate FTSS primarily because FTSS failed to pay on a timely basis, or at all. Codefendants response is FTSS was terminated without just cause and the payment terms contained in the Agreement were verbally modified (something the Agreement expressly prohibits since it has a clause that requires all amendments be in writing). Freightliner denies such changes in payment terms and further alleges, in any case, changes in payment terms do not excuse non-payment nor undermine such conduct as a valid cause for termination under Act 75. We need not decide the ultimate contractual or legal issue of this dispute, since the inquiry before us is to determine if codefendants are likely to succeed on their lack of "just cause" theory.

At trial, the outcome may differ, but at this juncture that possibility seems very low. Based on the weight of the evidence, and after three (3) days of testimony, this Magistrate Judge agrees with plaintiff's Rule 52(c)[9] dismissal request in that codefendants did not make a sufficient showing they are likely to succeed on the merits of their claim. Indeed, codefendants failed to make a *prima facie* case they were terminated without just cause while plaintiff did, in turn, make a strong demonstration that it did not arbitrarily terminate FTSS.

Act 75 authorizes the termination of a dealer for "just cause." Gemco Latinoamérica, Inc. v. Seiko Time Corp., 623 F. Supp. 912, 918 (D. P.R. 1985); Warner Lambert Co. v. Superior Court of P.R., 101 D.P.R. at 399 (1973). "Just cause" is relevant to this case, as to

[9] Plaintiff presented a Fed.R.Civ.P. 52(c) motion at the close of codefendants' evidence to which the Court gave careful thought, but held the same in abeyance. Our main conclusion today is, based on the record as a whole, and primarily on codefendant's evidentiary showing, they have failed to meet their burden for injunctive relief.

the "nonperformance of any of the essential obligations of the dealer's contract on the part of the dealer...." P.R. Laws Ann. Tit. 10 § 278 (d). When the dealer fails to comply with an essential obligation of a dealer agreement, the principal has "just cause" to terminate the contract and can do so without payment of damages. Dyno Nobel, Inc. v. Amotech Corp., 63 F.Supp. 2d 140, 150 (D.P.R. 1999). "Paying for goods on time is usually considered an essential obligation of a dealer's contract and a violation of said obligation constitutes "just cause". Tatan Mgmt. v. Jacfran Corp., 270 F. Supp. 2d 197, 201 (D.P.R. 2003).[10] Just cause is a question of fact. La Playa Santa Marina, Inc. v. Christ-Craft Corp., 597 F.2d 1, 4 (1st Cir. 1979).

In this case, the evidence shows it is uncontested FTSS owes Freightliner a substantial amount of money. Mr. Carreras, as president of FTSS, admitted under oath, both on direct and cross-examination, FTSS has not paid Freightliner for eighteen (18) trucks it ordered between July 2003 and February 2004. (Tr. at pp. 155-157 and 180-183); and the amount of that debt is approximately $900,000. *Id.*[11] The Agreement between FTSS and Freightliner is for the purchase, sale, service and distribution of Freightliner trucks in Puerto Rico; clearly then,

---

[10] *See* Dyno Nobel, 63 F. Supp. at 150. (Distributor's repeated failures to pay on time and to comply with payment plans are just cause for termination); Cándido Oliveras, Inc. v. Universal Insurance Co., 141 D.P.R. 900, 919-920 (1996); PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd., 931 F.2d 138, 139 (1st Cir. 1991); Biomedical Instrument & Equip. Corp. v. Cordis Corp., 797 F.2d 16, 17 (1st Cir. 1986).

[11] Although at first Mr. Carreras indicated FTSS only owed eight (8) trucks, (Tr. at pp. 155-158 and 173); under questioning by his own counsel he testified, using a list provided by his counsel and entered into evidence as part of Defendants' Exhibits AA and FF, that FTSS has not paid for eighteen (18) trucks. Later, on cross-examination, he roughly added up the amounts on that same list (**Defendants' Exhibit AA and FF**) and admitted the outstanding debt was more than $900,000. (Tr. at pp. 155-157 and 180-183).

payment of the trucks by the dealer is an essential element of the Agreement.  (**Joint Exhibit I at p. 2**).

Furthermore, pursuant to the terms of the Agreement, Freightliner required payment in advance by check or wire transfer or an irrevocable letter of credit or guarantee.  Those terms were never modified in writing as required by the Agreement.  (Tr. at p. 179).  Mr. Carreras' testimony Freightliner allowed FTSS to first sell the trucks in Puerto Rico before it needed to pay Freightliner, *i.e.* a consignment arrangement, (Tr. at pp. 104-105, 109 and 214-215) is not supported with credible evidence.  Codefendants did not present any document to support their allegation the payment terms were varied or that Freightliner sold to them on consignment.  Section 24 of the Agreement requires any modification to the Agreement be in writing and signed by both parties.  Mr. Carreras's testimony is legally insufficient to avoid the literal interpretation of Section 24 which required express written consent by the parties to modify the terms.  *See, e.g.*, Nike Int'l., Ltd, 689 F. Supp. at 1238 (dealer's failure to comply with contractual requirement for written notice of renewal was an omission that left it unprotected by Act 75); *cf.* Raytheon Catalytic, Inc. v. Gulf Chemical Corp., 959 F.Supp. 100 (D. Puerto Rico 1997).

In contradiction to Mr. Carreras' testimony, the evidence presented showed another company of Mr. Carreras, United, issued a letter of guarantee for each of the eighteen (18) trucks which codefendants admitted they did not pay for. (Tr. at pp. 206-207).  Pursuant to the terms of the letters of guarantee issued by United, payment to Freightliner had to be made no

more than twenty (20) days from arrival at port of chassis of the trucks. (**Defendants Exhibit FF; Tr. at p. 52**). There was no indication on the need for codefendants to provide payment guarantees from United for every single one of the trucks they admittedly owe if, as alleged, the sales were on consignment. The evidence further demonstrated that, of those eighteen (18) trucks, at least six (6) were sold by FTSS, and that it was paid in full, yet it never paid Freightliner even under the terms it claims were modified by the parties. (Tr. at pp. 181-182, 204-205 and 250). Thus, FTSS still failed to pay Freightliner for trucks it sold to its end customers. Mr. Carreras' testimony that "Freightliner did not accept partial payments" (Tr. at p. 182) is unconvincing.

Even assuming the payment terms were modified as FTSS alleges, and that such modification passes the Nike test at trial (that is, the modifications did not have to be in writing), codefendants still had an obligation to pay for the trucks they ordered and resold. The duty to pay is an "essential obligation" in a dealers' contract. Tatan Mgmt., 270 F. Supp. at 201. Consistent failure to pay past-due invoices has been held to violate an essential obligation of any business relationship. Even if a principal has tolerated an overdue balance or sought to resolve disputes amicably through payment plans, the dealer is not excused from timely performance of its obligations to pay. *Id.*[12]

---

[12] Codefendants put too much weight on Biomedical, 797 F. 2d at 16 , and wrongly conclude the case held non-payment is not "just cause" under Act 75. First, what Biomedical held was that for purposes of summary judgment, Plaintiff dealer had raised a triable issue of fact as to whether or not non-payment had been used as a subterfuge for termination since there was evidence the true reason for termination was not late payments but the principal's perception the dealer was not performing well. 797 F. 2d at 17. Second, the particular facts of that case are contrary to the ones in this case. In Biomedical, the parties had tacitly agreed to late payments on some occasions and the principal had not complained or showed such late payments caused it any injury. 797 F. 2d at 18. Here, the issue is non-payment (not late or partial payments) and there is overwhelming evidence Freightliner consistently tried to collect the long overdue debt and placed the dealer on credit hold on various occasions. (**Defendants' Exhibit FF**).

In this case, this Magistrate Judge finds payment was an essential obligation of the Agreement and FTSS unjustifiably violated that obligation. Whether or not the Agreement was modified to the point that FTSS's failure to pay was justified may be an issue for trial, but for purposes of an injunction petition, codefendants have clearly failed to present sufficient and persuasive evidence to show they are likely to succeed on the merits of their Act 75 claim.

Furthermore, there was additional evidence presented at the hearing which shows Freightliner may likely have alternate grounds for terminating FTSS for just cause.

Another reason provided by Freightliner for terminating FTSS was it had eighteen (18) trucks shipped to Puerto Rico in 2004, without Freightliner's knowledge or authorization (**Defendants' Exhibit AA**). These eighteen (18) trucks did not have ABS and were thus non-compliant with United States law. Fourteen (14) of these trucks were seized by United States Customs agents and eventually were returned to Mexico at Freightliner's expense. FTSS, on the other hand, claims it was Freightliner who shipped those eighteen (18) trucks to Puerto Rico (Docket Nos. 41 and 70).

Regarding the shipment of the trucks, FTSS relies primarily on statements made by Mr. Carreras at the hearing (to the effect that he could not "illegally bring the trucks from a Mercedes Benz factory...to Puerto Rico" and that the did not steal the trucks.) (Tr. at pp. 128-129). It also relies on two (2) commercial invoices regarding the eighteen (18) trucks which have a Freightliner heading. (*See* invoices admitted as part **Defendants' Exhibit BB**). The brunt of the evidence shows the then General Manager of FTSS, Mr. José Torres, was the person in charge of placing the orders for Freightliner trucks and arranging for their shipment from Mexico

and importation to the United States, including Puerto Rico. **(Plaintiff's Exhibits 9, 10, 11; Tr. pp. 307-308 and 312-318**). Mr. Torres was also involved in various communications with Mr. Luis Ricardo García, International Sales Manager for DCVC Mexico, an affiliate of Freightliner LLC, regarding not only the ordering of these eighteen (18) trucks, but the fact that they did not have ABS. (**Plaintiff's Exhibits 12, 13; Tr. at pp. 312-318**).

To FTSS's detriment, Mr. Torres was not produced by codefendants as a witness nor was any statement by Mr. Torres put into evidence. Given that another argument FTSS uses to claim unjust termination under Act 75 is that Freightliner purposefully shipped these non-compliant eighteen (18) trucks as an excuse to terminate FTSS, (Docket Nos. 41 and 70) then it was FTSS's burden in seeking an injunction to show a probability of success on the merits of this claim as well. However, without any testimony from Mr. Torres, FTSS cannot prevail on its petition for injunctive relief upon inconsistent testimony by Mr. Carreras. (Tr. at pp. 128-129).

The persuasive evidence at the hearing and in the record is that Freightliner did not participate in the shipment of these eighteen (18) trucks. Rather, it was the agents of Mezcladoras, the body-builder in Mexico, that upon instruction from FTSS, had these trucks shipped to Puerto Rico. (Tr. at pp. 310-313). Freightliner had no contractual relationship whatsoever with this body-builder. (Tr. at pp. 312-313). Moreover, FTSS hired customs broker Nestor Reyes, Inc. to ensure the importation of the same. (**Defendant's Exhibit BB, Tr. P. 219**). Indeed, FTSS actually sold four (4) of these trucks, in February-March 2004, to Andrés Reyes Burgos, Inc. in Puerto Rico. (Tr. at pp. 135 and 203-204).

Consequently, at this juncture, FTSS is unlikely to succeed with its claim that it had nothing to do with the shipment of these trucks or that Freightliner was involved in such shipment.

As to the ABS issue, the evidence presented at the hearing was that FTSS, through Mr. Torres, ordered the eighteen (18) trucks knowing they did not have ABS. Later, after the order was filled, FTSS tried getting Freightliner/DCVC Mexico to install them, which Freightliner refused to do. Also that Freightliner understood FTSS would have the ABS installed in Mexico before the trucks were shipped. (**Plaintiff's Exhibit 9, 10, 11 and 12; Tr. at pp. 329-330, 363-365 and 370-371**). Indeed, Freightliner thought the eighteen (18) trucks were "on hold" at the body-builder and only found out they had been released and shipped after they arrived in Puerto Rico. (Tr. at pp. 338-340).

Here again, codefendants have not only failed to make a showing they will likely prevail on the merits of their claims.

As for the commercial invoices, the matter certainly raises serious concerns. Although codefendants introduced them into evidence (**Defendants' Exhibit BB**) they did nothing to authenticate them except to have Mr. Carreras read they indeed said "Freightliner". Second, Ms. Sabina Vieru, Export Finance Analyst for Freightliner, testified she was the only person who could issue such invoices and she did not issue those presented by codefendants at the hearing. (Tr. at pp. 263-275). Furthermore, Ms. Vieru testified the invoices contained textual information and a format she would never use, but also because the invoice numbers which were used belong to two (2) entirely unrelated Freightliner invoices. *Id.*

This Magistrate Judge considers Ms. Vieru's testimony credible and consistent with the documentary evidence presented. On cross-examination by FTSS, Ms. Vieru admitted the controversial invoices "looked similar" to ones normally issued by Freightliner. (Tr. at pp. 284-285). Still, the weight of the evidence proves codefendants' claim that Freightliner shipped the eighteen (18) trucks to Puerto Rico is without merit.

In light of the above, codefendants have failed to demonstrate they can prevail on the merits of this case and injunctive relief would be unwarranted on this basis alone. New Comm., 287 F.3d at 8-9.

Even though our inquiry on the request for preliminary injunction could end here, we continue to discuss the other factors to determine the appropriateness of injunctive relief, because they support our recommendation FTSS' preliminary injunction request be denied in this case.

**2. Codefendants Failed to Establish Irreparable Harm.**

Codefendants failed to present any evidence to support their claim they will suffer irreparable injury if the preliminary injunction is not issued. This Court has stated that stereotypical and unsupported allegations of "irreparable damage" are insufficient to merit the issuance of injunctive relief. *See* Picker International, 826 F. Supp. at 614. Furthermore, codefendants' particular alleged damages are, in and of themselves, insufficient to merit the relief requested.

FTSS's attempt to meet its burden on this injunction criteria was limited to Mr. Carreras' conclusory testimony he had lost potential sales and his reputation was affected in some

unspecified way. (Tr. at pp. 163-165). Yet, Mr. Carreras testified FTSS had not lost "a single [Freightliner] client" since it was terminated. (Tr. at p. 107).

The only other evidence submitted by FTSS were two letters from apparent clients cancelling potential orders for Freightliner trucks because FTSS was no longer a Freightliner dealer. (**Defendants' Exhibits DD and EE; Tr. at pp. 163-165**). Assuming this constitutes "injury", it can be repaired by means other than an injunction. An injunction --of any kind— should not be issued in this case because of the simple fact that codefendants have available alternative legal remedies to redress their legal grievance and have failed to show that any "urgent" or immediate equitable relief should issue at this juncture of the case. Moore's Federal Practice 3D § 65.36 [3]. Picker, Int'l, 826 F. Supp. at 611. All of their alleged injuries which involve loss of income and reputation, may be compensated with a monetary award. This fact alone precludes granting injunctive relief. Puerto Rico Conservation Foundation v. Larson, 797 F. Supp. 1066, 1069 (D. Puerto Rico 1992); Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F. 2d at 174. Loss of income, without more, does not establish irreparable harm.

In addition, we cannot obviate the length of time which elapsed in this case between the filing of Freightliner's complaint on September 13, 2004 (Docket No. 1) and FTSS' request for preliminary injunction under the Dealer's Act object of this report and recommendation which was filed on January 11, 2005. (Docket No. 70). Thus, FTSS waited almost four (4) months to file its preliminary injunction request after this case was filed. This situation clearly shows FTSS lacked any urgency and militates against irreparable harm.

In sum, codefendants' attempt to obtain injunctive relief at this time lacks competent evidence concerning their allegations of irreparable harm and for this reason alone should not prosper. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004) (*citing* Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8 (1st Cir. 2000) (failure to show irreparable harm is sufficient grounds for denying preliminary relief even if the other requirements of the preliminary injunction standard are met).

**3. Balancing of the Interests.**

As part of our inquiry, we need to make a comparison between the harm to the movant if no injunction issues and the harm to the objector if one does issue. New Comm, 287 F.3d at 8-9.

On the one hand we have codefendants who failed to present any evidence to support their claim they will suffer irreparable injury if the preliminary injunction is not issued, as discussed above. On the other hand, plaintiff was quite detailed in showing the harm FTSS's conduct has caused it and will continue to cause it if an injunction were issued. On the issue of the fourteen (14) trucks alone, Mr. García testified it has cost Freightliner at least $230,000.00 up to now to warehouse, broker, ship the trucks, etc. (Tr. at pp. 344-346). Although these damages are, as with those claimed by FTSS, not "irreparable", that is not the test. Here, FTSS has failed at its burden of proving the threatened harm outweighed the harm a preliminary injunction would inflict on the non-movant New Comm., 287 F. 3d at 8-9. In this "balance of harms" the same tips towards Freightliner's interests and not those of FTSS; especially

considering the likelihood that "just cause" will be found. *See* Luis Rosario, 733 F. 2d at 173 (the strength of the parties interests may depend on the likelihood that just cause will be found).

**4. A Preliminary Injunction in this Case Would Not Serve the Public Interest.**

The public interest does not heavily favors granting injunctive relief requested by codefendants. The public interest is clearly expressed in the legislative history of Law 75: "Law 75 was enacted in order to protect the interests of commercial distributors operating in Puerto Rico from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products. R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 482 (1st Cir. 1994); Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d at 820.[13]

The public policy behind Act 75 is to avoid the abusive practices of principals who would, without just cause, eliminate their dealers or distributors as soon as a favorable market was established. *See* Warner Lambert v. Trib. Superior, 101 P.R.R. 378 (1973); Roberco, Inc. v. Oxford Industries, 122 D.P.R. 115 (1988). In essence, "the basic 'public policy' of the Act is to prevent dealer termination without 'just cause'". Luis Rosario, Inc., 733 F.2d at 173. The presence [or absence] of just cause affects the consideration of the public policy objectives of the Act and the parties' interests for purposes of the request for provisional remedies under Article 3-A of Act 75. Pan Am. Computer Corp., 652 F.2d at 1217.

[13] *See* Vulcan Tools of Puerto Rico v. Makita USA, Inc., 23 F.3d 564, 568 (1st Cir. 1994). *See also* Statement of Motives of Act 75, 1964 P.R. Laws, 4th Reg.Sess. 231.

It cannot be disputed that Act 75's public policy is not to protect distributors who deal unfairly with their principals and abuse the protections afforded under the Act.   No public policy inherent in the Act 75 can save a dealer from his own omissions. *See* Nike, 689 F. Supp. at 1239 (Act 75 cannot protect a dealer from his own omissions to follow contractual terms) nor cure blatant violations of essential obligations, the most basic of all, being that one should pay for what one purchases. *See also* Tantan, 270 F. Supp. at 201.

Act 75 is a shield, not a sword.  Certainly, Act 75 was not enacted to protect distributors who have engaged in conduct the Act recognizes as just cause for termination as in this case. The public interest is better served by denying the injunction requested by FTSS.

Under such circumstances, when reviewing a request for injunctive relief made under Law 75, a court should consider how the merits of movant's action will affect its interpretation of the parties' interest and the requested injunction's effect on Law 75's public policy. *See* Pan American Computer Corp. v. Data General Corp., 652 F.2d at 217.  The traditional equity tests for a traditional injunction should be " ... tempered for purposes of [Law] 75". *See* Systema de Puerto Rico, 123 D.P.R. at 379.

Considering above discussed, the public interest is not favored by issuing FTSS' preliminary injunction request.

## VI. CONCLUSION

In view of the foregoing, it is this Magistrate Judge's opinion codefendants have failed to establish *prima facie*  the prerequisites for entitlement to preliminary injunctive relief under Act 75, as well as under the requisites for the granting a temporary and provisional injunction

even under the liberal standards of Law 75, namely: it has a substantial likelihood of succeeding on the merits; it will suffer irreparable harm in the absence of injunctive relief; the harm to it if injunctive relief is not granted far outweighs any inconvenience to such defendant/movant if such relief is granted; and the public interest weights heavily in its favor.

Accordingly, it is recommended codefendants' request for preliminary injunction BE DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order.  Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F2d 4 (1st Cir. 1986).  See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th  day of March 2005.


s/CAMILLE L. VÉLEZ-RIVÉ
CAMILLE L. VÉLEZ-RIVÉ
UNITED STATES MAGISTRATE JUDGE